Case number 23-2167 from the District of Northern Iowa, Joe Cannon v. Michael Dehner et al.  Thank you, your honor. May it please the court. A government defendant has qualified immunity unless a plaintiff demonstrates both a clearly established constitutional right and facts that would allow a fact finder to conclude that that right has been violated. Falling short of either one requires judgment for the defendant. Here, there is no clearly established right to the care that Cannon demands, in the way he demands it, on the timetable he demands it, or from the people from whom he demands it. And the undisputed facts here demonstrate that the defendant's conduct was not even negligent, much less rising to the level of criminal recklessness that deliberate indifference requires. One of the things, just as an overall sort of, I guess, question or comment is, this is sort of a comedy of errors here, in the sense that it would be very unusual if one were not in prison for somebody to wait four weeks or whatever it ended up being to get a cast on a broken bone, broken wrist. And so I just, maybe it's a bunch of people acting individually, which makes this a little different, but it doesn't look very good from sort of a deliberate indifference point of view, that you have somebody who repeatedly goes to the doctor and then ends up having to have surgery because, well, the bone healed improperly. Two responses to that, Judge Strauss. One, yes, it is the instance here that this was several different people acting individually. There are no allegations that they were acting in concert to deliberately deny treatment to Cannon. And two, I'm not so sure that in this instance we can characterize Cannon as repeatedly visiting the doctor. The timetable of events is, he has the basketball injury on a Sunday. According to, we have to take the facts as they're most favorable to him on this summary judgment, he asks an LPN in the yard to have a look at his wrist. He then goes to the infirmary without an appointment to have his wrist looked at. The first response, as I understand it, is you should go in the morning. If it's not an emergency, you go to sick call in the morning. Correct. And then he doesn't do that. He goes at night and claims an emergency. He does. And the two nurses, at least one nurse looks and says, I don't see an emergency. Yes, Your Honor. That was Nurse Devaney. This is a sick call thing. Correct. And he doesn't go back to sick call after that. Your Honor, he does go back to sick call the next morning. That's Shipley. Yes, that's Nurse Shipley, who then applies the ACE bandage and tells him to keep it on ice, to elevate it, gets him another pillow, and gets a prescription from the doctor for ten days of pain medication. That is perfectly in line with what the nurses testify to in their depositions is the proper course of treatment for that. If there's not a break. And they say that they can't diagnose a break. I understand that. But now, so what effort does he make to get someone to diagnose a break after Miss Shipley says, I don't see that? Well, he requests a doctor's appointment five days later.  Five days later. Yes, Your Honor. And is that when he gets the appointment or is there a delay now? At that point, there is a delay. He follows up then five days after that to say, I still want to see the doctor. The nurse who responds to that message, not one of the nurses who's ever sued as a defendant, says that she'll schedule it. Then on August 17, four days later, when he was expecting there to be an appointment, there is not an appointment. And the next day he writes and says, what happened to my appointment? At no point in any of those times did he go back to the infirmary to present himself for follow-up care. Even though when Nurse Shipley gave him the meds and gave him the ice. She said come back in a week, didn't she? She said follow up as needed. Okay. And he never did. Although I will say, just to follow up on that, it is an extremely painful injury. I haven't broken my wrist, but I've had a child break his wrist three times. Twice displaced, once non-displaced. And you definitely cannot sleep. It's extremely painful because you use your wrist for nearly everything. And it doesn't, I mean, maybe you can disabuse me, but it doesn't look like anybody actually gave it a really close examination of the wrist. I know that the x-ray is a different issue. But did they give it a thorough examination? I guess Shipley kind of gave it a thorough examination that first day and thought it wasn't broken? Or was she unsure about it? Shipley, that was the next morning. And Shipley looked at it and did not identify it as an emergency. And said that it was a possible break. And that it required being wrapped, at least wrapped with an ACE bandage, elevated and iced. And that was the treatment that she gave it. Did she diagnose it as unsure what it was? Or did she diagnose it whether it was a break or not? Or did she diagnose, I don't think this is a break. Because that can make a difference too. As they testified, the nurses cannot diagnose whether or not something is broken. The determination she made was that it was not an emergency. And having broken my wrist, I can agree with your child, Your Honor, that yeah, it is very painful. And it is very hard to sleep. But by the time that Cannon does go back to the doctor, and Cannon himself testifies in his declaration, he could have gone back to the infirmary if he had gotten the pass from one of the correctional officers. He never does. And I understand that he doesn't sue the people who didn't schedule the appointment through the kiosk. So the five days later, and then the five days later, he sent, I guess, the equivalent of emails or notes or something via the computer. And none of those people are sued or even sued as Jane Does, John Does, or anything like that. Am I correct about that? Yes, that's correct, Your Honor. And it's essentially an internal prison email system. And he never sues any of those nurses. And when he finally does get in on the 18th, that's when another nurse, who is not sued, looks at him, gets a splint, calls the doctor, gets a prescription for 30 days of pen medication, and gets an order for an x-ray, which happens three days later on one of the occasions twice a month when the x-ray technicians come to the prison. And at that point, that's a Saturday. The very next Monday, Dr. Daner diagnoses him for the break and orders him to be referred to UIHC, where they make the same diagnosis and prescribe the same course that Dr. Daner prescribes, which is keep it splinted and let it heal. And we'll see if it heals properly. Mr. Cannon puts a lot of weight on the fact that his treatment could have been better. That is not the standard. Section 1983 and the 14th Amendment do not constitutionalize medical malpractice claims. In this case, it's tough to say that this even rises to the level of medical malpractice. Even the expert that Cannon brought in to testify does not say that the care Cannon received did not meet the standard of care. What he says is, had people acted faster, there could have been a different outcome. But he also says it's typical practice to just prescribe pain medication for the first 24 to 72 hours and then follow up. And we know that Cannon did not follow up until much more after 72 hours had passed when he had already been given that pain medication. What about the very first nurse? Was it Devaney? There's Nurse Friedman, who was an LPN, who Cannon says he visited in the yard and also says was in the infirmary when he went and visited Nurse Devaney. And there was, as I understand the allegation, there wasn't even an evaluation by her. Does that change the dynamic? You're saying sort of, what's the standard treatment so long as something happened? But my understanding is that she wouldn't see him. That is his allegation, and that was what the district court found. That's a disputed fact that would have to go to the jury. But even if that's true, it's not clearly established that being forced to wait 16 hours for a non-emergent medical appointment is a clear violation of the Constitution. It might constitute negligence. It might have been malpractice for her not to do that. But there's no evidence anywhere, and there are no cases anywhere, that say that making a prisoner wait that long to get your wrist evaluated for a broken bone constitutes a violation of your right to be free from cruel and unusual punishment. But if you wait from 1st of August to into October to get a broken bone treated, that seems to be longer than just a negligent delay. And if it had been the same nurse who was pushing him off and pushing him off and pushing him off, there would be an ability to draw an inference that she in fact was deliberately delaying this to cause him pain to the extent that it rose to that level of recklessness. That could be deliberate indifference. But it's not. We have three different nurses who each claim to have done three different things, and then there's a long wait until we get to Dr. Daynor, who as soon as he is told this looks like it might be a break after that initial 72 hours has passed, orders the X-ray and makes the diagnosis that the later doctors agree with. That's even several days, right? There's three days for the X-ray, two days before he reviews it, then he doesn't put on his order to expedite this, sort of get him in there, and then says, well, you can delay because you can always re-break it. Correct. That doesn't sound great. It does not sound great. There's also no evidence that that's not the proper standard of care, that once the bone has started to heal, if it has started to heal improperly, you wait to see whether or not that's going to be a problem and then go in for surgery afterwards. Once the doctor has gotten there, the three weeks have already passed. There's nothing Dr. Daynor can do about that. He can't go back in time to get the X-ray earlier. So does the record show that the improper healing had already taken place by the time he saw Dr. Daynor? The X-ray, I believe that the X-ray that they got showed that the fracture had already started to mend, and the testimony from both Dr. Daynor and from the expert was that the bone likely would have started to have mended by that point. Because it seems like it's a different thing to say, well, yes, if that actually happens, that's what you do. You try to do the best you can. You re-break it and reset it. That's different than saying, well, we don't really worry about how long it takes because we know if we're late and it starts to improperly heal, we can just re-break it. And, Your Honor, nobody disagrees that re-breaking it later is, at best, the second best course of action. The question here is whether or not that constitutes deliberate indifference to a serious medical need, and it simply doesn't. Unless there are further questions right now, I'll reserve the remainder of my time for rebuttal. Thank you. Ms. Donalds, we're glad you were able to get here. The weather cooperated at least a little bit. Michael Ganz tells me that lawyers seem to think that having a remote argument in the courtroom at the last minutes is sort of like pushing a button on your smartphone. It's not. It's very difficult. And that's why what our decision was, if you couldn't make it, we would have the argument either submitted on the brief or we would hear opposing counsel, and if we needed more argument, we would schedule it. I made it here judged, so it's water under the bridge, but I do appreciate your explanation. May it please the Court, my name, as you know, is Jessica Donalds, and I'm here on behalf of Mr. Joe Willey Cannon, who is an inmate of the Anamosa State Penitentiary. I think we need to take a second look at what the facts are in this case when construed in Mr. Cannon's favor. He broke his wrist on August 2nd while he was playing basketball. He saw Nurse Friedman in the yard, showed her his wrist, explained how painful it was, and asked if he could go to sick call because he needed a pass to go to sick call at this time. That was Mr. Cannon's testimony in a sworn affidavit. She asked him to wait until morning, and he returned to his cell. However, his pain increased. Another inmate looked at his wrist and said, something's wrong, man, you need to go to sick call. Mr. Cannon showed his wrist to the officers on duty, and they agreed. They gave him a pass to go to sick call. He didn't walk out of his unit and go to sick call on his own. He got a pass to do so, and he went there, and he spoke with some corrections officers and requested that the nurses come out and evaluate him for a potential broken bone. Nurse Devaney sent the message back to the corrections officers saying he would not be seen. Mr. Cannon continued to ask to be seen. When Ms. Devaney and Ms. Friedman came out of wherever they were sitting and explained to him again, you will not be seen. Go back to your cell. Other facts have developed through litigation. They've come up with an explanation for what happened on August 2nd where they decided it wasn't an emergency without documenting that interaction, without physically touching Joe Cannon's wrist, palpating it to see if there was any deformity. That might be an issue for the jury, but that's not what the facts are that this court has to deal with. So the true issue before the court is construing the facts in Mr. Cannon's favor. Are these defendants entitled to qualified immunity? Were they aware of facts which would indicate a serious... Those two. Well, I'm starting with those two, Judge. Okay. Thank you. Starting with those two... But you have to do each one. Of course, Judge. And I think it's a very fact-dependent analysis for each defendant in this case, which is why some of the defendants were dismissed voluntarily by Mr. Cannon during the summary judgment litigation. But starting with those two, Nurse Friedman and Nurse Devaney had clear indicators as they testified in their deposition that there were signs of a broken bone. Animosis policy is that if you suspect a broken bone, you call the doctor, you evaluate, you get instructions. That never happened. They violated policy. They didn't tell... Is it alleged that Friedman's response in the yard was deliberate indifference? No. No, it would be limited to... So the only... Is it August 2nd, the day it happened? So the only August 2nd allegation against Nurse Friedman is the allegation that she was there when Devaney came out and said you won't be seen. Yes, Your Honor. I don't... Why is that? Why is that? Inmates ask nurses questions in the yard, Your Honor. It's not an excellent location to do a medical exam. No, but... So then you have no claim on August 2nd against Nurse Friedman except she came out with Nurse Devaney. Why is that enough? Because Nurse Friedman and Nurse Devaney both had an obligation, as Nurse Friedman testified to what the policy was, to evaluate a potential broken bone, prescribe treatment, and notify the doctor because neither nurse is qualified to diagnose a broken bone on their own. That's something that requires a doctor's involvement, and there was testimony in the record that it's the policy to involve a doctor as soon as possible to prevent the harms that can come from not treating a broken bone. So from that, we know... Does it matter, just to follow up, does it matter that they didn't actually examine him at that point? Even if they suspected a broken bone, they couldn't be sure of it. Does that make any... I mean, I'm sure you're going to say that's worse, but I just wonder because you need a knowledge and a disregard of the knowledge. Of course it matters. Mr. Cannon told them what his symptoms were. And so they had knowledge that he had fallen on the basketball court, bent his wrist, and that he was in excruciating pain, that he had limited range of motion, and that he was swelling. Each of the nursing defendants, particularly Ms. Friedman and Ms. Devaney, acknowledged that that requires an evaluation for a broken bone, which they refused to do. That's deliberate indifference. That is when you have knowledge that should alert you to a serious medical need, and you either interfere with that medical need, you refuse to provide treatment for it, you delay it in ways that cause inmates harm. Turning to the next day, the third, Mr. Cannon requested permission to come to sick call using the amnimosis inmate email system, which he received, and he did come to sick call, and he was evaluated by Nurse Shipley. He told her the same historical basis for his injury. He told her the same symptoms. His wrist was swollen. He had limited range of motion to no range of motion. He was experiencing numbness, and he was in, again, excruciating pain. Ms. Shipley did evaluate him and provided some treatment, but again, she critically failed because she cannot diagnose a broken bone. Anamosa has a policy in place. These need to be treated quickly. They need to be evaluated so that the wrist does not heal in a displaced position. You contact the doctor. You get the doctor to look at the bone and determine what course of treatment is necessary. She didn't do it. The only thing she told the doctor was, I've got an inmate here in some pain. Can we get a 10-day supply of Motrin, which the doctor approved. What about the fact that it's not displaced? I probably have more experience with wrist injuries, as I mentioned, than a lot of people, not personally, but a child. There's a huge difference between one that's visibly displaced and one that's non-displaced. You can't really, on a non-displaced one, see that the bone is broken. Does that make a difference here as regards to Nurse Shipley? It informs the need for an x-ray. The deposition testimony from Dr. Diener and from the more knowledgeable nurses was that you can have a wrist bone broken and displaced without visible displacement to the external eye. This is because displacement can be incredibly small, only a few degrees. However, that still affects healing and range of motion and use of the limb if it heals in a minimally displaced position. That just highlights the importance of an x-ray. We don't have to guess if Mr. Joe Cannon's wrist is broken. We have the technology to figure it out for ourselves. The refusal to take those steps, particularly over such a long period of time, I don't think we'd be here if this was just a week delay for an x-ray. That is what constitutes deliberate indifference. All of the nurses were subjectively aware of the need to bring this to the doctor's attention so that he could take that next step of getting an x-ray, and they did the bare minimum. The state makes a great deal about Mr. Cannon's failure to return to the SIT call over the next several days or weeks. I don't think that that's held out by the record. What we do have in the record is that this is happening during the pandemic. Mr. Cannon's understanding is that if he does not have an appointment, he needs to make one. He needs a SIT pass. Mr. Cannon also understands from going to SIT call with a SIT pass on the first day, August 2nd, that if it's not an emergency, he won't be seen. And Mr. Cannon also knows he needs to see the doctor because so far the treatment he's gotten from the nurses is not treatment. It's an ACE bandage. It's Motrin. He's not being evaluated for a broken bone despite the ongoing pain. What about the five-day delays in terms of the kiosk? I mean, you've got those delays, plus you haven't sued those people who caused the delays, the John Does, Jane Does, nurses, whoever answered those emails. Starting with the second issue first, that those people haven't been sued. One of them was Nurse Cannon, and it might have been a generic medical staff inbox as well. Given the deliberate indifference standard, a negligent failure to schedule an appointment might not be enough on its own. It would certainly be enough in combination with other factors. But when you are litigating 1983 cases, there are a lot of difficult decisions to be made. There are very exacting burdens of proof that must be made. And Mr. Cannon and his counsel have focused on the most liable actors in this case. Turning to the five-day delay, Mr. Cannon is an inmate. He has been an inmate for a long time, actually, for longer than I have been alive. And he is very familiar with the system at the Anamosa State Penitentiary. This is a system where you're damned if you do, and you're damned if you don't. If you are a chronic complainer, you will be treated as such, even when your complaints are legitimate. Mr. Cannon waited as long as he could, hoping that he would have an appointment with the doctor, because that's who he really needed to see. And when he didn't make progress, he tried to be patient, and he kept following up. He kept following up, asking to see the doctor. And it took until, I believe, August 25th before he finally did. So, stepping back in time a few days to August 22nd, this is when Mr. Cannon is finally re-evaluated. It's 20 days past the injury. He's been in constant pain this whole time. And Nurse Newhouse follows Anamosa State Penitentiary policy. She evaluates him for a broken wrist, and she immediately notifies the doctor, we've got a suspected broken wrist, we need to do something about that. That's why Nurse Newhouse was voluntarily dismissed after discovery. Nurse Newhouse was not deliberately indifferent to a serious medical need. She did what Nurse Friedman, Nurse Devaney, and Nurse Shipley all had the opportunity to do, all had the knowledge that they needed to do something, and failed to do. However, that didn't end the delays in Joe Cannon's treatment of his broken wrist. The testimony below was that there is an x-ray available on site about every two weeks. However, there was the authority and the ability to refer an inmate to UIHC, or anywhere else that has an x-ray machine for that matter, if an x-ray was needed more urgently. Mr. Cannon was lucky that when an x-ray was ordered on August, I believe, 20th, or yeah, August 20th, that an x-ray was going to be available as soon as August 22nd. However, he was not referred off campus, off the facility for an earlier x-ray. And Dr. Diener, who had ordered the x-ray, who knew that symptoms of a broken wrist had been persisting for approximately 20 days at that point, waited three further days to review the x-ray itself. At this point, he diagnosed it as a non-displaced fracture, although there's a fact issue on that, because the University of Iowa Hospitals and Clinics has diagnosed it as a minimally displaced factor. And he tells Mr. Cannon that a cast needs to be put on as soon as possible to encourage healing, and that he will refer him to UIHC. However, Dr. Diener does not follow through on the course of treatment that he has determined is necessary. He does not refer Joe Cannon to UIHC as soon as possible for a cast. In fact, this appointment happened on August 25th, and Mr. Cannon was not sent to UIHC until September 10th. And this was after Mr. Cannon filed a grievance saying, I'm supposed to be at UIHC getting a cast. This has been a comedy of errors from day one. What was Dr. Diener's role in that? Is it because, is it the assertion that he failed to say this is urgent, like get him in right away? Is that part of the claim against him? I think it is, and I think there's a potential jury question there because it's not 100% clear in the record. Although he told Mr. Cannon that it would be as soon as possible, he did not reflect the urgency on the referral to UIHC, and he also described it as a non-displaced fracture on the referral to UIHC. Didn't he write as soon as possible somewhere on the form? On his own medical notes, which he kept for internal treatment at Anamosa State Penitentiary, it did say as soon as possible. Do the nurses, so normally in a doctor's office, I don't know how it works in prison, but the doctors usually tell a nurse or something, hey, call so and so at such and such clinic because I have a special case that somebody needs to see. Is that the procedure here, or does the doctor personally call and set up the appointment? That doesn't appear in the record, Judge. I'm afraid I can't answer that. I do know that there is a UIHC referral form. What happens with that form is a mystery to me. But it is undisputed that it took about 17 more days for Mr. Cannon to get to UIHC. Now, the state also places a lot of weight on the fact that at that time, at that appointment, the UIHC doctors continued the conservative course of care that had already been in place from the Anamosa treating team. However, that's not worth very much because they continued this plan of care because it was too late to do anything else. By that point, the bone had healed in a slightly displaced position. The only thing left to do was to see whether that slightly displaced position was a problem for Mr. Cannon or not. Was it already too late by the time he got to Dr. Daner? Is that in the record? I believe that it's in the record that it would have started to heal by that point. And is there anything in the record of the difference between starting to heal and then by the time you get to Iowa for that final decision of, okay, we've got to continue this conservative course of care? I don't think so, Judge. On these facts, each of the defendants were subjectively aware of a serious medical need, and they didn't address it. The qualified immunity analysis is simple. Under the Eighth Amendment, you have a right to be free from that subjective mental state. May I conclude briefly? I see my time has expired. The right under the Eighth Amendment is to be free from that subjective mental state of deliberate indifference. That right is well established in every deliberate indifference case that this court has considered. It's a fact-intensive analysis, and under the facts in this case, the court was right to deny summary judgment and let a jury decide. Thank you. May it please the Court? Yes. What happens with that form is a mystery to me, is the exact problem with this case. There is no evidence in the record showing that that form was the responsibility of Dr. Daner, of Nurse Friedman, of Nurse Devaney, or of Nurse Shipley.  None of them is responsible for that delay. The request that he get an x-ray sooner, that is the exact problem that the court addressed in Jenkins v. Hennepin County. That is the problem the court addressed in Johnson v. Hamilton. That is the problem that the court addressed in passing in its two-paragraph affirmance of the district court in Slack v. Werentine. All of those we've cited in our brief. And none of the cases that Cannon has cited to the court established that this sort of delay is criminally negligent to the extent that the nurses or the doctor should have known that they shouldn't have delayed. Lanker v. Norris, that's about an inmate who had previously been taken to the ER for this particular problem and to whom the defendants were denying post-operative treatment. Merler v. Shonin, that's about a post-operative heart transplant patient. McRaven v. Sanders, that's about an inmate who the defendants knew had overdosed on drugs. The case that comes closest is DeRosette. DeRosette, that's a case where the two defendants themselves had repeatedly refused to furnish hearing aid batteries to the plaintiff. We know that it has to be beyond capital that the plaintiff have a right that is protected by the Constitution or by statute and that it has to be beyond capital that the defendants know that their conduct violates that right. Here we have a series of you could have done more and you didn't follow the policy. None of that arises to the level of criminal recklessness that the Supreme Court requires to establish a violation of the Eighth Amendment through the 14th. We ask that the court reverse and render judgment for the defendants. Thank you. Thank you. Thank you, Counsel. The case has been thoroughly briefed and well argued and we will take it under advisement. Does that complete the morning's argument? It does, Your Honor. Very good.